**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| **UNITED STATES** ) | |
| ) | |
| v. ) | DOCKET NO. 2:21-CR-0024-DBH |
| ) | |
| **SUSAN ULVILA** ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

"Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results."
*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.),
*aff'd*, 747 F.3d 111 (2d Cir. 2014).

Susan Ulvila respectfully submits this memorandum in support of her position at sentencing that a variant, time-served sentence followed by three years of supervised release sufficiently serves the goals of sentencing delineated in 18 U.S.C. § 3553(a)(2). Indeed, imposing a guideline sentence in Susan's case would lead to the "bizarre results" referenced above because the advisory guideline range does not fit her circumstances.

Susan is fifty-seven (57) years old, and her life has been complicated. Since childhood, she has had to navigate a tough confluence of emotions stemming from chronic trauma and abuse as a child, teenager, and young adult. Revised Presentence Investigation Report (ECF #36) (hereinafter, "PSR") ¶¶ 34, 38. Research has found that "adverse childhood experiences have a profound, proportionate, and long-lasting effect on emotional state, whether measured by

1

depression or suicide attempts, by protective unconscious devices like somatization and dissociation, or by self-help attempts that are misguidedly addressed solely as long-term health risks."[1] "Adverse childhood experiences, such as abuse and neglect, but also single parenthood and divorce as well as parental substance abuse increase the risk of substance abuse in adulthood."[2] Thus, it is no surprise that Susan's adverse childhood experiences resulted in profound depression and self-medication with drugs and alcohol. The effects of her childhood trauma were further exacerbated by the abuse she endured during her twenty-three-year marriage. But she survived by compartmentalizing her pain and focusing on the care of others through her decades-long nursing career. Susan characterizes the life she led before her recent recovery and treatment as wearing "two masks." She was a source of strength and nurture to her patients, but outside of her job, she was lost, going through the motions of life like a "zombie" who "didn't feel at all." PSR ¶ 40. That duality ultimately took its toll, resulting in her inability to practice nursing and the criminal conduct at issue in this case. But that existence is behind her now and she is learning to live a life of clarity and self-forgiveness, free of drugs and alcohol.

Susan's acceptance of responsibility in this case was immediate and sincere, and she has shown nothing but respect for the Court and the justice system since her release on March 22, 2021. She has complied with all court-ordered conditions of release, PSR ¶ 3, and graduated from an intensive nine-month residential treatment program for women with addictions and mental health disorders. Following her graduation, Susan moved into El Rancho de la Vida ("The Ranch

---

[1] Vincent J. Felitti & Robert F. Anda, *The Hidden Epidemic: The Impact of Early Life Trauma, Section 7, The Relationship of Adverse Childhood Experiences to Adult Medical Disease, Psychiatric Disorders, and Sexual Behavior: Implications for Healthcare,* (2009) (R. Lanius and E. Vermetten, eds.).
[2] Annika von Borczyskowski, et al., *Alcohol and Drug Abuse Among Adults Who Grew Up in Substitute Care – indings from a Swedish National Cohort Study*, 35 Children and Youth Services Review 1954 (2013).

of Life"), a recovery residence in Hinkley, Maine, she engages in weekly therapy, and she is thriving.

While it is true that federal courts "must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process," the district judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 39, 50, n.6, 128 S. Ct. 586, 597 (2007). Further, in *Pepper v. U.S.*, 562 U.S. 476, 487-88, 131 S.Ct. 1229, 1240 (2011), the Court emphasized the need for individualized sentencing, reiterating "the principle that 'the punishment should fit the offender and not merely the crime.'" (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). Given the foregoing directives of the U.S. Supreme Court and in consideration of the factors set forth in 18 U.S.C. § 3553(a), incarceration is unwarranted for Susan. To be clear, Susan has never minimized the seriousness of her conduct, but extricating her from family, therapy, and the recovery community to imprison her for any period of time, especially given the present conditions of confinement, would harm, or even eradicate, the progress she has made towards reform.

As detailed here, Susan's history and character merit a variant sentence, as do the circumstances of the offense, and when the purposes of sentencing are weighed against that backdrop, there can be but one conclusion: the appropriate sentence is non-custodial with community service and three years of supervised release.

**I.     GIVEN SUSAN'S HISTORY, CHARACTER AND DEMONSTRATED CAPACITY FOR CHANGE AND GROWTH, COUPLED WITH THE CIRCUMSTANCES OF THE OFFENSE, A DOWNWARD VARIANCE IS NECESSARY.**

   **A.    SUSAN'S LIFE IS A COMPELLING STORY OF SOMEONE WHO WAS RAISED UNDER EXTREMELY DIFFICULT FAMILY CIRCUMSTANCES, WHO THEN BECAME THE BACKBONE OF HER OWN FAMILY DESPITE THESE EARLY DIFFICULTIES.**

Susan does not and will not blame anyone for her mistakes, her addictions, or her mental

health struggles. She does not blame her biological father, who according to her mother, was "never home" and was "drunk and abusive when he was home."[3] PSR ¶ 34. He is described by another family member as "an angry and vindictive man" who "verbally and physically" abused Susan, her mother and her brother.[4] She does not blame her mother for the difficult years that followed her parents' divorce, "when she was subjected to several years of insecurity with a less than stable home life."[5]

Through recent intense mental health treatment, however, Susan acknowledges that her mental health struggles first arose                                    . She was nine when she developed anorexia, an eating disorder, to try to gain some control over her life and cope with her emotions and lack of self-worth. PSR ¶¶ 38, 39. This was the onset of her depression, as well. PSR ¶ 39. Although Susan recovered from anorexia, to escape her anguish, she turned to alcohol and drugs in high school. PSR ¶ 39. But while some in her situation become overwhelmed with anger and resentment, Susan's life has been driven by compassion.

As the numerous letters provided to the Court attest, Susan has always placed others first, and she is considered by friends and family to be a fundamentally kind, hard-working and decent person. Her sister Rachel writes:

> I remember when it was time for the senior prom, there was a boy who had Down syndrome in her class. He was crying in class one day because he was left out and no one would take him because he was different. Susan took him by the hand and said "Timmy, I would be honored if you would be my date for the evening." That type of kindness is

---

[3] *See* Letter of Support from Nancy Gaecklein dated October 19, 2021, marked as Defendant's Exhibit 1.
[4] *See* Letter of Support from Rachel Gaecklein dated December 11, 2021, marked as Defendant's Exhibit 2.
[5] *Id.*

>    typical of Susan.[6]

Following high school, Susan worked tirelessly to put herself through nursing school. Rachel further explains:

> After high school, Susan followed in Mom's footsteps and went to nursing school, because she wanted to care for people. One of her first nursing jobs was at a school for mentally challenged and deaf children in New Hampshire. Sue wanted to be able to communicate with the students, so she began teaching herself sign language. A student at the school was living in a stressful home environment, so she would spend whatever time in Susan's nursing office just to have a safe and protective place to be.[7]

Eventually, Susan left New England to become a traveling nurse. In that capacity, she worked in short-term roles at hospitals, clinics and other healthcare facilities throughout the United States to help fill gaps in areas where there were nursing shortages. PSR ¶46. Perhaps if Susan had cared for her own needs as much as the needs of others, she would not be standing before this Court.

Susan's depression persisted throughout her life, resulting in suicidal ideation and two psychiatric hospitalizations in her fifties: the first in 2016 and most recently in March of this year. PSR ¶ 40. During her hospitalization this year, she was also diagnosed with bi-polar disorder. *Id.* Through recent counseling, Susan now realizes that she self-medicated her mental health struggles with drugs and alcohol beginning in high school. PSR ¶¶ 40, 42. Along her travels as a nurse, Susan met a man who introduced her to methamphetamine when she was twenty-seven years old. PSR ¶ 42. The euphoria from the drug was something she had never experienced, and the temporary eradication of her chronic depression was immediately addicting. For the next two years, she was a daily user. *Id.*

When Susan met her ex-husband Dan while working in Arizona in 1993, she hoped to get

---

6 *Id.*
7 *Id.*

clean and focus on creating a better homelife for her future family than she had growing up. She and Dan married quickly after meeting, and she gave birth to her son Lucas a year later in 1994. Her son Joshua was born the following year. Tragically, her ex-husband turned out to be the mirror-image of her biological father: a verbally and physically abusive bully. Her sister Rachel writes:

> I wouldn't meet Dan until several years later, but my parents would worry about the way Susan was treated by her husband. According to them, he was controlling, manipulative and verbally mistreated Susan. For several years he would not allow her to bring the children home to Maine to visit. When her two boys were young, she would be the sole provider for the family. Dan never held a job, instead he stayed home while Susan worked many, difficult hours as a nurse. It would be almost two decades later that Susan would leave her husband, Dan.

Susan loved being a mother; it came naturally to her. She fought hard to keep the family intact, enduring years of her ex-husband's violent outbursts and emotional abuse. Once again, she used drugs and alcohol to cope until it all became too much for her to handle and she made the excruciatingly painful decision to leave the family home after eighteen years of marriage. It was 2011 and they were living in Washington State at the time. Dan refused to let the boys go with her, but Susan knew that she had to leave Washington to save herself. Life with Dan had been very dark and isolating. She continued to provide financial support to Dan and her sons as she tried to catch her breath and get her bearings back at her parents' home in Maine. Susan stopped using methamphetamine for several years, but she continued to struggle with alcohol. In 2014, Susan moved back to Washington to be near her sons but reconnected with old friends and started using methamphetamine again.

Susan returned to Maine in 2016 and suffered the tremendous loss of her brother Dennis, who died of complications from alcoholism. The combination of Dennis' death, divorce, untreated

6

mental health issues and substance abuse finally broke Susan at the age of 52, necessitating psychiatric hospitalization. PSR ¶ 40. After that first hospitalization, she spent the next several years walking a thin line between completely falling apart and robotically going through the motions of daily life.

In 2017, at the age of 53, Susan had never been in trouble with the law in any capacity, but her substance use disorder finally got the best of her. Susan drove cross-country to Washington to visit her sons. She purchased methamphetamine to bring back to Maine for personal use. On her drive back, she was stopped in South Dakota for speeding. A search of her purse and car yielded marijuana and methamphetamine, resulting in two drug charges and a paraphernalia charge. PSR ¶ 27. Susan spent a few nights in jail before her parents posted her bail. She quickly accepted responsibility and pled guilty, but sentencing was deferred for eighteen months, and she was placed on probation, which was transferred to Maine. For the first time, Susan engaged in substance abuse treatment through an intensive outpatient program and became sober. PSR ¶ 42. She fully complied with the conditions of probation and her case was dismissed six months early.

Then in 2019, Susan relapsed while visiting old friends in Washington State. As reflected in the PSR, Susan had flown to Washington due to concerns about her son's opiate use and convinced him to move to Maine. PSR ¶ 9. While her son tied ends up in Washington, Susan stayed with friends who used drugs and alcohol, and she eventually succumbed to temptation and relapsed. Her judgment severely impaired, before flying back to Maine, she arranged for a friend to send her methamphetamine through the mail. *Id.* When her supply ran out, she sent money to Washington to purchase more, which was again mailed to her. This pattern continued until a package was finally intercepted in October 2020, leading to the present charge. PSR ¶ 7.

    **B.**    **THE SERIOUSNESS OF THE OFFENSE IS SIGNIFICANTLY MITIGATED BY SUSAN'S EXTREME REMORSE AND POST-OFFENSE REHABILITATION.**

    The investigation in this case stemmed from a tip to law enforcement that Susan and her son were both methamphetamine users and that her son sold methamphetamine to afford his habit. PSR ¶ 5. On October 3, 2020, law enforcement intercepted a package from the U.S. Mail addressed to Susan and believed to contain methamphetamine. When a narcotic detecting K9 failed to indicate on the package, law enforcement agents confronted Susan at her place of employment, and she ultimately admitted that the package contained methamphetamine, which she purchased by sending money to a source of supply out of state. PSR ¶ 8. She admitted to obtaining methamphetamine in this manner for approximately a year and a half and that she distributed a portion of the drugs to her son, a mortifying pill to swallow. PSR ¶ 10. In fact, the reality of her conduct and potential consequences nearly drove her to take her own life, necessitating another hospitalization in March of this year. *Id.*

    Susan was aware that her son was likely selling some of the drugs to support his own habit, but she willfully made herself blind to that fact. Her son has denied engaging in distribution and no charges have been filed against him. Susan blames herself entirely and has taken full responsibility for the offense. Despite having a sound claim to suppress the admissions she made to law enforcement officers, Susan chose to waive that claim, as well as her right to a trial. On June 16, 2021, Susan pled guilty to one count of Attempted Possession with Intent to Distribute Methamphetamine. The Revised Presentence Report reflects a Total Offense Level of 27 based on 99.05 grams of methamphetamine "mixture" and "actual" involved over the course of the offense. PSR ¶ 20. However, prior to her sentencing, Susan will have met the criteria of USSG §5C1.2(1)- (5), resulting in a two-level reduction of the offense level to 25. Susan's near flawless history

establishes a criminal history category I. PSR ¶ 28. The resulting advisory Guideline range is 57-71 months. Pursuant to the parties' Plea Agreement, the Government will recommend a three-level downward variance based on Susan's agreement to plead guilty and be sentenced by video. PSR ¶ 50. If the Court accepts this recommendation, the resulting Guideline range is 41-51 months.

The aggravating factors in this case are the potency of the drug in question, the quantity involved and the duration of the conduct. While these factors are serious, they do not mandate incarceration for Susan. No weapons, violence or threats of violence were involved in the offense, and Susan has no history of violence whatsoever. She has no prior convictions. The scheme lacked sophistication, involved little planning and Susan took few steps to conceal what she was doing. The driving force behind her conduct was a substance use disorder. Susan obtained no financial benefit from her conduct. When confronted by law enforcement officers, Susan was respectful, admitted her conduct, saved the Government the expense and burden of the grand jury process and agreed to proceed with her change of plea and sentencing by video.

As mentioned previously, overcome with remorse about her conduct, Susan was hospitalized after her Initial Appearance in this case. During her hospitalization, she came to terms with her substance use disorder, sought out treatment and transitioned directly from the hospital to Maine General Women's Residential Program in April. PSR ¶ 44. This was an intensive nine-month program focused on treating addictions and mental health challenges. Susan fully engaged in the program and completed a tremendous amount of hard work around the impact of her childhood trauma. In September, her therapist wrote:

> Ms. Ulvila had done well at the program. She has learned relapse prevention skills relative to regulation her emotions and skills relative to both addictive and criminal thinking. She has followed the rules well. She has taken feedback constructively…Ms. Ulvila has consistently expressed regret for her illegal behaviors as well as regret for the impact on

her family. She has a great deal of shame and remorse about these behaviors. As a high functioning nurse contributing to society for quite a number of years, the illegal behaviors are out of character for the person she was prior to her addictions dominating her life.[8]

Susan graduated from Maine General's program in November and transitioned to a sober recovery house at El Rancho de la Vida. The Director and Founder of the residence recently wrote:

> Susan lobbied us very hard for the opportunity to come here for more treatment and recovery housing while waiting for her sentencing date. Susan is an exceptionally nice and smart woman that is very remorseful for her activities leading to her arrest and pleading guilty for her charges…As an addict in long term recovery, I know what Susan is going through, and feel that Susan is very motivated to do the right thing for herself and I for one, have every hope that Susan will go on to living a full life without drugs or alcohol.[9]

These letters of support, as well as several others, speak volumes about Susan's true character and capacities. Friend and colleague, Kim Reed Upham, wrote:

> [Susan] has worked with me at Hannafords and the person I know is a very hard worker, always ready to tackle any job asked of her. Always friendly and helpful to any customer. Was always at work when scheduled and on time (working during the pandemic). Gave her full support and help to all of us working with her. This is the person I know Susan to be.[10]

Longtime family friend and retired nurse, Debra Morse, wrote:

> As I stated [Susan] is a very capable and smart woman…with the help of addiction services, she could be an asset to the state of Maine and many people that are in the throes of alcohol or addiction.[11]

Hard-working, capable, smart, remorseful, and committed to rebuilding her life through sobriety and intense mental health treatment. That is who Susan is and she is finally starting to forgive herself and heal. ¶ 44. She regularly attends individual therapy every week. She is intentional about how she cares for herself. She exercises, meditates, eats healthy, stays hydrated and reads self-help

---

8 *See* Letter of Support from Richard Watson dated September 22, 2021, marked as Defendant's Exhibit 3,
9 *See* Letter of Support from James H. Lebish, Founder/Director of El Rancho de la Vida dated December 29, 2021, marked as Defendant's Exhibit 4.
10 *See* Letter of Support from Kim Reed Upham dated December 1, 2021, marked as Defendant's Exhibit 5.
11 *See* Letter of Support from Debra L. Morse dated December 1, 2021, marked as Defendant's Exhibit 6.

books. In fact, she states that she is doing and feeling the best she's ever felt in her life. Susan has done what society needed her to do: rehabilitate, maintain sobriety, and engage in mental health treatment. Incarceration would undoubtedly harm the progress she has made in treatment or destroy it altogether. Removing her from her family, friends, and the recovery community would contradict the goals of sentencing.

## II. THE DISPARITY RESULTING FROM THE PURITY-DRIVEN METHAMPHETAMINE GUIDELINE WARRANTS A VARIANT SENTENCE IN THIS CASE.

As noted in the Addendum to the Presentence Report, Susan is aware that District Court in Maine has declined to adopt a categorical policy disagreement with the Commission's treatment of "pure" methamphetamine versus a "mixture" containing methamphetamine, like the New Hampshire District Court did in *United States v. Bean*, 10019WL 1003338 (D. N.H. March 1, 2019). But as noted by Judge Singal in his decision in *U.S. v. Kaufman*, 2:18-cr-36-GZS (ECF #134), the policy arguments outlined in *Bean* can still be relevant to the 3553(a) analysis. One such argument is directly on point in Susan's case: purity is a poor proxy for her culpability. This was not a conspiracy to distribute methamphetamine into the community. This was an arrangement for Susan to obtain drugs for herself and her son. Susan made no profit from what she shared with Lucas. Furthermore, the only evidence that Lucas was distributing was an anonymous tip and Defendant's gut instinct, to which she purposely turned a blind eye. Yet despite having no knowledge of or direct involvement in her son's activities, she nevertheless took full responsibility. The purity disparity is arbitrary and unwarranted in Susan's case.

For a net amount of 99.05 grams of methamphetamine "mixture," the corresponding base offense level would be 24 pursuant to USSG §§ 2D1.1(a)(5) and (c)(8). After adjustment for

Acceptance of Responsibility and a §5C1.2(1)-(5) reduction, the total offense level under this analysis would be 19, with a corresponding advisory imprisonment range of 30-37 months. When combined with the 3-level variance contemplated by the plea agreement, Susan's total offense level would be 16, with a corresponding advisory imprisonment range of 21-27 months. Susan is not asking this Court to modify the guideline calculations but is pointing out the resultant difference as a reference point for the impact that the disparate treatment of the two substances has on her sentence. Because purity is a poor proxy for Susan's culpability, a downward variance is appropriate.

### III. SUPERVISION, NOT ADDITIONAL INCARCERATION, WILL ACCOMPLISH THE PURPOSES OF SENTENCING.

Congress instructed judges as follows:

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added). Congress directed the Sentencing Commission to "ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society" while permitting "increased use of restitution, community service, and other alternative sentences" in all other cases. See Pub. L. 98-473, § 239, 98 Stat. 1987, 2039 (1984). Congress identified when supervision should be the presumptive sentence, when some term of imprisonment should be imposed, and encouraged the use of non-prison alternatives in between. Supervision would be generally appropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." *See* 28 U.S.C. § 994(j). Some term of imprisonment would be generally appropriate for "a person convicted of a crime of violence that results in serious bodily

12

injury." *Id*. For defendants between these poles, Congress encouraged the use of non-prison sentences in a variety of ways. For example, Congress recognized that probation would often satisfy sentencing purposes *other than* correction and rehabilitation:

> It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose. This is particularly true in light of the new requirement in section 3563(a) that a convicted felon who is placed on probation must be ordered to pay a fine or restitution or to engage in community service."

*Id*. Furthermore, in 1996, Commission staff authored a paper entitled *Sentencing Options under the Guidelines*,[12] which acknowledged that non-prison sentences are associated with less recidivism than prison sentences,[13] and that "alternatives divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties."[14]

While Susan is technically not a first offender, her previous criminal matter was certainly at the low end of the seriousness spectrum: mere possession of a usable amount of marijuana and methamphetamine by an addict. She spent a few days in jail after her arrest and the case was dismissed early for good behavior. PSR ¶ 27. The present offense is clearly more serious than the first, but when the totality of circumstances is examined in the context of the statutory purposes of sentencing, all arrows point to the conclusion that a time-served sentence followed by three years of supervised release with significant community service is sufficient, but not greater than necessary.

---

12 U.S. Sentencing Commission, Staff Discussion Paper, *Sentencing Options under the Guidelines* (Nov. 1996), available at http://www.rashkind.com/alternatives/dir_00/USSC_sentencingoptions.pdf.
13 *Id.* at 18.
14 *Id.* at 19.

13

### A. THE SERIOUSNESS OF THE OFFENSE, PROMOTING RESPECT FOR THE LAW AND JUST PUNISHMENT DO NOT REQUIRE ADDITIONAL INCARCERATION.

As mentioned at the beginning of this Memorandum, Susan has never minimized the seriousness of her conduct. This bears repeating because it is important for the Court to understand her mentality at this point. Nor does she feel entitled to supervision in lieu of additional incarceration because of her recovery and compliance on pretrial release. But her post-arrest conduct absolutely mitigates the seriousness of the offense.

In assessing respect for the law, several factors justify the proposed sentence. Susan has no history of non-compliant behavior. She was on probation once before and committed no violations. PSR ¶ 27. She has been entirely cooperative with the arresting officers, U.S. Probation, and the prosecutor. She has been tremendously successful on pretrial release. She has demonstrated acceptance of responsibility for the offense. She has had a positive attitude toward the justice system and certainly took no steps to obstruct justice.

In assessing just punishment, the Court must consider how Susan would serve her prison time. *See Koon v. United States*, 518 U.S. 81, 112, 116 S. Ct. 2035, 2053 (1996) (finding no abuse of discretion when the sentencing court determined that the anticipated conditions of confinement were a mitigating factor justifying a below-guideline sentence); *U.S. v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) (J. Posner) (finding merit in the defendant's argument that the harsher the prison conditions, the shorter the sentence should be). The current pandemic has changed the nature of incarceration as we previously knew it. Since March 13, 2020, BOP "modified its operations" to respond to the spread of COVID-19. At present, federal inmates are generally confined to their cells all day. In-person visits are prohibited. Most programming has ceased and movement

throughout the facilities is limited.[15] Prison for Susan means she will spend it in lockdown conditions similar to solitary confinement, but she will also be at grave risk of contracting COVID-19, vaccinated or not, because social distancing is simply "impossible to achieve in our federal prisons," particularly during a lockdown.[16] Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings. Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities: on December 7, 2021, 254 inmates and 220 BOP staff were suffering from the virus;[17] as of January 3, 2022, 1,516 inmates and 511 BOP staff now have the virus.[18] 274 inmates and 7 BOP staff have died from COVID-19 disease.[19]

These conditions of confinement, while not rising to the level of "cruel," are certainly unusually oppressive and counterproductive. In Susan's case, given where her offense falls on the spectrum of serious offenses, given her demonstrated respect for the law and given the unjustly severe conditions of confinement due to the pandemic, just punishment does not mandate additional incarceration. While incarceration is qualitatively more severe than supervision in the community, supervised release is an onerous punishment that will substantially restrict Susan's

---

15 *See* Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last updated November 25, 2020).
16 Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); *see also* Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease* 2019 (COVID-19) in Correctional and Detention Facilities, https://bit.ly/2M9IF6a (last visited May 28, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").
17 https://www.bop.gov/coronavirus/ (last updated 12/7/21).
18 https://www.bop.gov/coronavirus/ (last updated 1/3/22).
19 *Id*.

liberty and protect the public. She will not be able leave the judicial district, move, or change jobs without receiving permission from her probation officer or the court. She must report regularly to her probation officer, permit unannounced visits to her home, and refrain from associating with any person convicted of a felony. She must refrain from the use of any drug, alcohol or intoxicant, continue mental health and substance abuse treatment and submit to random drug testing. Indeed, three years of supervised release when coupled with significant community service is far from an act of leniency. It is a significant and just punishment. Moreover, Susan's conviction, in and of itself, is a severe penalty because it will make her a felon. The stigma of a felony conviction is permanent and pervasive. It will irreparably damage her reputation and will pose a significant barrier to employment.

### B.     DETERRENCE DOES NOT REQUIRE ADDITIONAL INCARCERATION.

Regarding deterrence, the empirical research shows no relationship between sentence length and deterrence.  Instead, research shows that the *certainty* of punishment has a deterrent effect, but increases in the severity of punishments do not yield significant (if any) deterrent effects…Three National Academy of Science panels reached that conclusion, as has every major survey of the evidence."[20] In one study regarding specific deterrence, research showed no difference in deterrence even between probation and imprisonment.[21]  That is, offenders given terms of probation were no more or less likely to reoffend than those given prison sentences. Perhaps most significant, the Sentencing Commission itself has found that "[t]here is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or

---

20 Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).
21 *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995).

high guideline offense level, recidivism rates are similar."[22] Additionally, Susan is fifty-seven years old and recidivism rates decline with age.[23] Incarceration does not satisfy the deterrent purpose of sentencing any more than a non-custodial sentence. Thus, deterrence is not a good reason to impose incarceration in this case.

      C.      INCARCERATION IS UNNECESSARY TO PROTECT SOCIETY.

Susan poses no danger to society. She is sober. She is treating her mental health issues. She has never been convicted of any crime before and her criminal history score is 1. By all accounts, Susan would not hurt a fly. She is remorseful and has accepted responsibility. She has insight into her conduct and is genuinely motivated to change.

Moreover, the "growing body of evidence suggests that our over-reliance on incarceration may in fact undermine efforts to keep the public safe."[24] The data shows that "[a]s more people are incarcerated for a wider variety of offenses, the public safety payoff diminishes significantly."[25] Furthermore, "[m]ost who study prison life believe there are significant brutalizing effects to imprisonment that impair prisoners' inclination to conform to the law."[26] Susan is not a danger to society, but federal prison could change that, which is why incarceration is unnecessary to protect the public.

---

22 *See* USSC, *Measuring Recidivism* at 15, http://www.ussc.gov/publicat/Recidivism_General.pdf.
23 *Id.* at 9.
24 *Transforming Prisons, Restoring Lives: Final Recommendations of the Charles Colson Task Force on Federal Corrections* (January 26, 2016) at ix; http://www.urban.org/events/transforming-prisons-restoring-lives-final-recommendations-charles-colson-task-force-federal-corrections.
25 *Id.* at 2.
26 *Id.* (quoting Dina R. Rose & Todd R. Clear, *Incarceration, Social Capital and Crime: Implications for Social Disorganization Theory*, 36 Criminology 442, 465 (1998); Sharon Dolovich, *Exclusion and Control in the Carceral State*, 16 Berkeley Journal of Criminal Law 259 (2011) (abstract of paper discussing "the self-defeating nature of current carceral practices — the way the combination of prison conditions and postcarceral burdens ensures that many people who have done time will return to society more prone to criminal activity than previously").

### D. REHABILITATION IS THE DRIVING FORCE IN THIS CASE.

Susan is a work in progress, and while the progress she has made is substantial, she still very much needs mental health and substance abuse treatment. The best place to receive that treatment is in the community where she has a significant support system. The progress she has made over the last nine months would be destroyed by unnecessary imprisonment, especially given the lack of rehabilitative programs in federal prison right now.

Susan also needs structure and the standard and proposed conditions of supervised release meet that need. Thus, in a case such as Susan's, where rehabilitation is the driving force of sentencing, time-served with three years of supervised release, including community service, satisfies Congress' mandate to impose a sentence that is sufficient, but not greater than necessary.

## IV. DESIGNATION AND SELF REPORT

If prison is imposed, we ask the Court to recommend that Susan be designated to in an institution in New England and to recommend her participation in the Residential Drug Abuse Program (RDAP).

And finally, we ask the court to allow Susan to self-report to the facility designated by the Bureau of Prisons.

Dated: January 4, 2022                /s/ Heather Gonzales, Esq.
                                       Attorney for Defendant
                                       Assistant Federal Public Defender
                                       P.O. Box 595
                                       Portland, Me 04112-0595
                                       207-553-7070
                                       FAX: 553-7017
                                       Heather_Gonzales@fd.org

18

## CERTIFICATE OF SERVICE

      I, Heather Gonzales, hereby certify that I have this date caused the within Sentencing Memorandum to be served upon Assistant United States Attorney David Joyce, Esq., by forwarding a copy to him via the Court's ECF System: david.joyce@usdoj.gov.

A copy has also been forwarded to U.S. Probation Officer Toni Baker, U.S. Probation, 400 Congress Street, 5th Floor, Portland, ME 04101 via email: toni_baker@mep.uscourts.gov.


Dated: January 4, 2022                                                       /s/ Heather Gonzales  
                                                                                      Counsel for the Defendant